IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-585

 No. COA21-149

 Filed 2 November 2021

 Durham County, No. 20 SPC 50081

 IN THE MATTER OF: A.S.

 Appeal by respondent from involuntary commitment order entered

 20 November 2020 by Judge Pat Evans in Durham County District Court. Heard in

 the Court of Appeals 6 October 2021.

 Yoder Law PLLC, by Jason Christopher Yoder, for respondent-appellant.

 Attorney General Joshua H. Stein, by Assistant Attorney General Rachel A.
 Brunswig, for the State.

 ARROWOOD, Judge.

¶1 A.S. (“respondent”) appeals from an involuntary commitment order

 committing him to an inpatient 24-hour facility for a period of thirty days. For the

 following reasons, we affirm.

 I. Background

¶2 On 6 November 2020, Barbara Persinger, respondent’s mother, filed an

 Affidavit and Petition for Involuntary Commitment in Granville County District
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

Court, which read:

 RESPONDENT IS AGGRESSIVE AND VERBA[L]LY
 ABUSIVE WITH HIS MOTHER AND ACT[T] TE[AM]
 MEMBERS. HE HAD A HAMMER IN HIS PANTS,
 HOWEVER HE DID NOT MAKE ANY MOVEMENTS TO
 USE IT AS A WEAPON. HE IS TALKING IN MULTIPLE
 VOICES. HE HAS PRESCRIBED MEDICATION, BUT
 HIS MOTHER DOES NOT THINK HE IS TAKING IT ON
 A REGULAR BASIS. MOTHER HAS PETITIONED THE
 GRANVILLE COUNTY SYSTEM FOR GUARDIANSHIP
 OF [RESPONDENT] SINCE HIS LAST PETITION.

Respondent was taken into custody on 6 November 2020 and delivered to Duke

Regional Hospital (“Duke”) in Durham County the next day. After a first-level

examination and evaluation were conducted on respondent on 7 November 2020,

Doctor Grace C. Thrall (“Dr. Thrall”) conducted a second examination on

8 November 2020. After the examination, Dr. Thrall described the following:

 [Respondent] is a 45 y.o. single white male with Brugada
 syndrome, schizoaffective disorder and past alcohol abuse,
 complicated by poor insight and medication nonadherence,
 requiring multiple psychiatric hospitalizations and
 followed by Carolina Outreach ACTT team. He presents to
 the D[uke] ED on petition by his mother for worsening
 psychosis characterized by disorganized thinking, growling
 speech, paranoia (walking around with a hammer in his
 pants x 2 days), increased verbal agitation with family and
 ACTT, and delusions about robots and artificial
 intelligence. His ACTT team believes he has not been
 compliant with his antipsychotic medications and is
 concerned he is not safe in the community, having
 assaulted his mother in the past when mistaking her for a
 robot and having taken an ax to most of his furniture and
 electronics and burned them on his grill.

Dr. Thrall concluded respondent was a danger to himself and others, and
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 recommended thirty days of inpatient commitment.

¶3 An involuntary commitment hearing was held before the Durham County

 District Court, Judge Evans presiding, on 20 November 2020 to determine the

 appropriateness of respondent’s involuntary commitment. Respondent, respondent’s

 counsel, and Doctor Leslie Bronner (“Dr. Bronner”), a Duke employee who had been

 treating respondent, were present at the hearing, while neither the State nor Duke

 had any counsel present. At the outset, respondent’s counsel objected to “proceeding

 without representation” for the State. The trial court overruled the objection and

 allowed the hearing to move forward. The trial court examined Dr. Bronner. Dr.

 Bronner testified, in pertinent part, to the following:

 [T]his is a 45-year-old patient with a history of
 schizoaffective disorder. He has more than 20 psychiatric
 hospitalizations. He came to Duke . . . due to medication
 non-compliance. He dismissed his outpatient treatment
 team. He was verbally abusive towards his mother. He
 was burning furniture, and so he was brought in for
 psychiatric evaluation. I saw him on the second day that
 he had been admitted to the psychiatric ward. I’ve been
 working with him daily since then, except for weekends.

 Initially he was very irritable and dismissive. He would
 barely talk to me. If he talked, he would not allow me to
 speak. He mainly talked about how he was not -- he was
 sort of blaming people for not allowing him to live on his
 own. He said that he has been medication compliant. He
 was dismissive of all of the things that his outpatient
 treatment team said, as well as his mother. He was
 medication compliant with his Invega. Initially, however,
 because of his behaviors, he’s had to be sequestered from
 the rest of the unit. He becomes agitated, he becomes
 verbally abusive to staff. He starts yelling, he starts
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 pacing. He is refusing medications to help him calm down,
 and so we still have not been able to allow him to interact
 with the rest of the ward.

 ....

 And so, because he’s not compliant with his oral
 medications, . . . he needs to be on a long-acting injectable
 medication. I talked to him about that yesterday. He said
 that he was not going to do it. He did not need to do it, and
 that he was going to take me to court to shut me
 up . . . . And so, he continues to need to be hospitalized
 because he remains a danger to himself and others.

¶4 Throughout this portion of Dr. Bronner’s testimony, respondent interrupted

 multiple times by, among other things, objecting, arguing against Dr. Bronner’s

 testimony, asking whether he would have the opportunity to represent himself, and

 making references to “stalkers . . . from Raleigh . . . that won’t leave me alone.”

¶5 Once Dr. Bronner was allowed to continue with her testimony, she stated:

 Because it’s been very difficult to manage his behaviors on
 the unit, he remains sequestered from other patients on the
 unit. He still needs to be hospitalized for further
 medication management and he also needs to be on a long-
 acting injectable to prevent further psychiatric
 hospitalizations due to medication non-compliance.

 When asked whether she believed respondent was a danger to others, Dr. Bronner

 replied that she did, and explained, in pertinent part: “He’s been agitated and

 verbally abusive to the staff and to me, and we’re unable to even allow him to interact

 with other people on the unit.” Dr. Bronner asked that he be committed for thirty

 days.

¶6 On cross-examination, Dr. Bronner testified that respondent had not made
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 threats or attempts to harm himself and “ha[d] not physically touched anybody” while

 at Duke, though “he postures and paces.” Regarding respondent’s willingness to take

 his prescribed medication, Dr. Bronner testified: “He’s partially compliant. He takes

 scheduled medication, but when he gets agitated and aggressive towards staff, we

 want to try to give him other medications to calm him down which he has refused and

 it just lets me know that he needs more scheduled medication.” At this point,

 respondent interrupted again.1

¶7 Next, respondent testified as witness. After mentioning his allergy to Lithium,

 respondent’s testimony, in pertinent part, proceeded as follows:

 Q. So, is the reason that you do not want to take some of
 the as-needed medication, or the long-acting injectable,
 because you’re afraid of allergic reactions?

 A. I am scared -- I’m paranoid of the needles. As part of
 my condition that it’s under my belief that there is a robot
 cybernetic unit, possibly from the International Robo Expo
 that has manipulated time and uses their plastic injectable
 disc to write them and lock us in certain discause [sic],
 where we’re punished . . . and our bodies are transported
 in and out for their amusement and for our punishment,
 and the needles scare me so bad, I am paranoid
 schizophrenic and it is because of exactly that injectables
 [sic].

 ....

 So I don’t mind taking the oral alternative. I’ve been
 compliant with the oral alternative for over 14 years now.

 1 Here, respondent appears to talk about his medication and claims he had been “completely

 compliant in all cases,” though much of his statement is unclear with portions marked in the
 transcript as indiscernible.
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

¶8 When asked whether he had ever thought about harming himself in the last

 month, respondent replied: “Absolutely not. I love myself. I don’t want to be harmed

 at all. I love myself, my family. I don’t want anybody else to be harmed.” When

 asked whether, while at Duke, he had “thought about harming anyone on the unit[,]”

 respondent replied: “I have not. I’ve actually taken note that there -- that black

 people from harming me [sic]. I even closed off the back corridors of the unit so that

 they can’t get in to harm me.” When asked by his counsel if there was anything else

 he wanted to share, respondent made a long, incoherent statement in which he made

 references to his paranoia of “the digital age[,]” “transposing time[,]” the mandate of

 “an unescapable hell[,]” and an “alien cross-communication virus . . . .”

¶9 Respondent’s counsel asked the trial court to find respondent was not a danger

 to himself or others, citing respondent’s testimony that he did not think about

 harming himself or others, that he had not made threats or attempts to harm himself,

 and that he had not touched others. Respondent interrupted throughout. The trial

 court concluded: “I do find that [respondent] has a mental illness, he’s a danger to

 himself and to others. He’s to be recommitted to the 24-hour in-patient facility for a

 period not to exceed 30 days.”

¶ 10 The trial court filed a written Order on the same day. In this Order, the trial

 court did not check box number four—“by clear, cogent, and convincing evidence, [the

 trial court] finds as facts all matters set out in the commitment examiner’s report

 specified below, and the report is incorporated by reference as findings.” However, in
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 the designated space below box number four, the trial court provided Dr. Thrall’s

 name—“Dr. Grace Thrall”—and the date of her last report on respondent—“11-18-

 20[.]” Conversely, the trial court checked box number five, indicating that it found

 “by clear, cogent, and convincing evidence” “facts supporting involuntary

 commitment[.]” This was followed by the trial court’s handwritten notes:

 Prior to court, [r]espondent insisted Judge recuse herself
 because unqualified to hear federal matters. He constantly
 interrupted proceedings; stating he was being stalked.
 Non-compliant when admitted to hospital and remains
 medication non-compliant. Has to be sequestered from
 others on unit because verbally abusive towards staff.
 Postures and paces. Told Doctor he would take her to court
 to “shut her up.” Dismissed outpatient treatment team.
 During direct examination, [respondent] babbled about
 intergalaxial [sic] conspiracies.

 Based on these findings, the trial court concluded respondent “has a mental illness”

 and “is dangerous” to himself and others, and ordered that respondent be committed

 to Duke for no longer than thirty days.

¶ 11 Defendant filed written notice of appeal on 24 November 2020. Because “[a]n

 appeal of right lies with this Court from a final judgment of involuntary

 commitment[,]” this appeal is properly before us. In re J.C.D., 265 N.C. App. 441,

 444, 828 S.E.2d 186, 189 (2019) (citations omitted).

 II. Discussion

¶ 12 Respondent contends on appeal that: (A) the trial court violated respondent’s

 due process right to an impartial tribunal because of the absence of a representative
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 for the State during the hearing, and because the trial court asked questions during

 witness testimony; and (B) the trial court erred in adopting Dr. Thrall’s report.

 A. Impartial Tribunal

¶ 13 “The due process right to an impartial tribunal raises questions of

 constitutional law that we review de novo.” In re Q.J., 2021-NCCOA-346, ¶ 19 (citing

 Dorsey v. UNC-Wilmington, 122 N.C. App. 58, 66, 468 S.E.2d 557, 562 (1996)). “In

 order to preserve an issue for appellate review, a party must have presented to the

 trial court a timely request, objection, or motion, stating the specific grounds for the

 ruling the party desired the court to make if the specific grounds were not apparent

 from the context.” Id. (quotation marks omitted) (quoting N.C.R. App. P. Rule

 10(a)(1) (2021)). Here, respondent’s counsel objected to proceeding without opposing

 counsel at the outset of the hearing. Thus, the issue has been properly preserved for

 our review. See id.

¶ 14 Respondent argues the trial court violated his right to procedural due process

 and an impartial tribunal because the involuntary commitment hearing proceeded in

 the absence of opposing counsel and because the trial court “examined witnesses,

 became a witness itself for events that occurred before the hearing started, and even

 entered evidence without informing the respondent or allowing the respondent to

 object.” We disagree.
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

¶ 15 As this Court has noted, there is no constitutional right to opposing counsel.

 Id. ¶ 21 (quoting In re Perkins, 60 N.C. App. 592, 594, 299 S.E.2d 675, 677 (1983)).

 Additionally, per our statutes:

 [T]he Attorney General may, in his discretion, designate an
 attorney who is a member of his staff to represent the
 State’s interest at any commitment hearing, rehearing, or
 supplemental hearing held in a place other than at one of
 the State’s facilities for the mentally ill or the psychiatric
 service of the University of North Carolina Hospitals at
 Chapel Hill.

 N.C. Gen. Stat. § 122C-268(b) (2019). Thus, here, because respondent was being

 treated at Duke, a private institution, there is no statutory requirement to have an

 attorney for the State present at respondent’s hearing. See id.

¶ 16 Further, for a judge to “preside at an involuntary commitment hearing and

 also question witnesses at the same proceeding” does not jeopardize a respondent’s

 constitutional rights. In re Q.J., ¶ 21 (quotation marks omitted) (quoting In re

 Jackson, 60 N.C. App. 581, 584, 299 S.E.2d 677, 679 (1983)). In fact, in such

 instances, “[j]udges do not preside over the courts as moderators, but as essential and

 active factors or agencies in the due and orderly administration of justice.” Id. ¶ 22

 (alteration in original). Thus, “[i]t is entirely proper, and sometimes necessary, that

 they ask questions of a witness[.]” Id. (citation omitted; second alteration in original).

 However, at the same time, trial courts cannot conduct themselves in such ways “that

 could be construed as advocacy for or against either” party. Id. ¶ 23.
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

¶ 17 Here, the trial court’s only substantive questions of Dr. Bronner on direct

 examination were the following:

 Q. All right, ma’am, whenever you’re ready . . . . Whatever
 it is you want me to know about why we’re here today.

 ....

 Q. All right ma’am. If you could start over slowly for me
 so I can take notes.

 ....

 Q. He was going to take you to court to what? . . . . Shut
 you up? Okay.

 ....

 Q. Anything else?

 ....

 Q. All right. You testified that you believe he’s a danger
 to himself. Do you believe he’s a danger to others?

 ....

 Q. And what do you base that on?

 ....

 Q. All right. And how long are you asking for?

 Similarly, during respondent’s testimony, the trial court only stated, “Thank you so

 much for sharing with me[,]” and, “Thank you for sharing with me, [respondent].”

¶ 18 Here, there is nothing from the transcript that indicates the trial court, while

 asking questions of witnesses, was advocating or intending to advocate for either

 party. See id. (finding no issue with the trial court when it asked on direct
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 examination: “All right, ma’am. Tell me what it is you want me to know about this

 matter”; “Anything else?”; and “I’m sorry. What was the last thing you said?”).

 Accordingly, the trial court did not violate respondent’s due process right to an

 impartial tribunal by allowing the hearing to proceed without opposing counsel and

 by asking questions itself. See id.

 B. Adoption of Dr. Thrall’s Report and Findings of Fact

¶ 19 Respondent argues the trial court erred in adopting Dr. Thrall’s report because

 it “did not find the report by clear, cogent, and convincing evidence,” “the report was

 entered by the trial court without notice to [respondent] in violation of his right to

 confront and cross-examine Dr. Thrall[,]” and the report contained inadmissible

 hearsay.

 1. Dr. Thrall’s Report

¶ 20 As a preliminary matter, we address the fact that the written Order does not

 check box number four while simultaneously providing pertinent information below

 it. Respondent argues that, because the trial court did not move to enter Dr. Thrall’s

 report into evidence during the hearing, or otherwise make any other mention of it

 prior to the issuance of its Order, it was error for the trial court to refer to it in its

 written Order. Particularly, respondent argues the trial court “considered the report

 in making its final determination” without “indicat[ing]” in the written Order “that

 it was finding all of the facts contained in the examiner’s report by clear, cogent, and
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 convincing evidence”—in other words, without checking box number four.

 Conversely, the State argues that, precisely because the trial court did not check box

 number four, the trial court did not incorporate Dr. Thrall’s report as findings at all.

¶ 21 “Certified copies of reports and findings of commitment examiners and

 previous and current medical records are admissible in evidence, but the respondent’s

 right to confront and cross-examine witnesses may not be denied.” N.C. Gen.

 Stat. § 122C-268(f). Throughout respondent’s hearing, the trial court did not move to

 admit Dr. Thrall’s report into evidence, and neither Dr. Thrall nor her report were

 ever mentioned in open court. Additionally, at the conclusion of the hearing, the trial

 court did not announce that it intended to incorporate Dr. Thrall’s report, or any

 report, when it ordered that respondent be recommitted. Cf. In re J.C.D., 265 N.C.

 App. at 443, 828 S.E.2d at 189 (“The trial court announced at the conclusion of the

 hearing . . . it would incorporate by reference as findings in the order the report of Dr.

 Ijaz and offered by Ms. Motley.”). Furthermore, because neither Dr. Thrall nor any

 other witness were present during the hearing to authenticate the report, any

 attempt to admit the report into evidence or otherwise incorporate it as findings

 would have been error. See N.C. Gen. Stat. § 122C-268(f).

¶ 22 Thus, here, the Record and the transcript do not reflect that the trial court

 admitted into evidence Dr. Thrall’s report during the hearing—nor do they reflect

 that the trial court inadvertently failed to check box number four in its written Order.

 Cf. State v. Smith, 188 N.C. App. 842, 845, 656 S.E.2d 695, 696 (2008) (concluding,
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 where there were inconsistencies between the hearing transcript and the sentencing

 form, that the transcript clearly indicated “that the trial court simply misread the

 sentencing form and checked the wrong box[,]” and thus concluding the trial court

 had committed a clerical error).

¶ 23 This Court has found that a “trial court’s checking of a box” by itself “is

 insufficient to support th[e] determination” that a respondent is a danger to himself

 or others. In re J.C.D., 265 N.C. App. at 448, 828 S.E.2d at 192 (quotation marks

 omitted) (quoting In re Allison, 216 N.C. App. 297, 300, 715 S.E.2d 912, 915 (2011));

 see also id. at 447, 828 S.E.2d at 191 (“Merely placing an ‘X’ in the boxes of the form

 order has been disapproved repeatedly[.]” (citation and some quotation marks

 omitted)). By the same logic, we conclude that a written order that, by virtue of not

 checking the designated box, does not expressly indicate the trial court “by clear,

 cogent, and convincing evidence[] finds as facts all matters set out” within a report

 cannot be construed to mean the inverse. Cf. id. at 447-48, 828 S.E.2d at 191-92.

¶ 24 Thus, here, because it did not enter Dr. Thrall’s report into evidence and did

 not check box number four in its written Order, the trial court did not incorporate the

 report as findings in its Order.2 See N.C. Gen. Stat. § 122C-268(f). Because we

 2 In this instance, we distinguish this case from our decision in In re Q.J., 2021-NCCOA-346.

 There, in dicta, the majority opinion described the report at issue as being incorporated as
 findings, “although the trial court listed the examination [the doctor] completed” without
 “check[ing] the box expressly incorporating the report as findings of fact.” Id. ¶ 13. There,
 the State and the respondent agreed that the doctor’s report had been incorporated by
 reference, and thus the respondent’s issues on appeal did not address the propriety of the
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 determine that the report was not incorporated, the remainder of respondent’s

 arguments regarding the propriety of the trial court’s mention of the report on the

 written Order are no longer properly relevant to our review.

 2. Findings of Fact

¶ 25 Respondent also argues that, without Dr. Thrall’s report, the trial court’s

 remaining findings of fact fail to support the finding that he was dangerous to himself

 or others. We disagree.

¶ 26 Even if the trial court had actually improperly incorporated Dr. Thrall’s report,

 the hearing testimony and the trial court’s findings of fact as listed on the remainder

 of its written Order, which are not based upon Dr. Thrall’s report in any respect, are

 sufficient to support the involuntary commitment Order.

¶ 27 “It is the role of the trial court to determine whether the evidence of a

 respondent’s mental illness and danger to self or others rises to the level of clear,

 cogent, and convincing.” In re Q.J., ¶ 26 (citation omitted). On appeal, “[t]his Court

 reviews an involuntary commitment order to determine whether the ultimate

 findings of fact are supported by the trial court’s underlying findings of fact and

 trial court’s written order. See id. ¶¶ 14, 30 n. 4. Thus, the majority in In re Q.J. did not
 reach the issue of whether a written order in which box number four is unchecked, but
 information pertinent to it is provided thereunder, constitutes incorporation. See id. ¶ 14.
 Here, because respondent argues that it was error for the trial court to “consider” Dr. Thrall’s
 report, by writing her name and the date of the report on the written Order, without expressly
 incorporating the report and without admitting it into evidence, and because the State
 specifically contends it was not incorporated, we address the issue outright.
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 whether those underlying findings, in turn, are supported by competent evidence.”

 Id. (citation and quotation marks omitted; alteration in original).

¶ 28 Per our statutes,

 [t]o support an inpatient commitment order, the court shall
 find by clear, cogent, and convincing evidence that the
 respondent is mentally ill and dangerous to self . . . or
 dangerous to others . . . . The court shall record the facts
 that support its findings.

 N.C. Gen. Stat. § 122C-268(j). Additionally,

 the trial court must satisfy two prongs when finding a
 respondent is a danger to self or others . . . : “A trial court’s
 involuntary commitment of a person cannot be based solely
 on findings of the individual’s history of mental illness
 or . . . behavior prior to and leading up to the commitment
 hearing, but must [also] include findings of ‘a reasonable
 probability’ of some future harm absent treatment[.]”

 In re Q.J., ¶ 25 (citation omitted; last three alterations in original). “Although the

 trial court need not say the magic words ‘reasonable probability of future harm,’ it

 must draw a nexus between past conduct and future danger.” Id. (citation and some

 quotations marks omitted).

¶ 29 Here, “[b]ecause we conclude the trial court properly found [r]espondent was a

 danger to [others], we do not reach the issue of whether he was a danger to [himself].”

 See In re C.G., 2021-NCCOA-344, ¶ 33.

¶ 30 Our statutes define “danger to others” as follows:

 Within the relevant past, the individual has inflicted or
 attempted to inflict or threatened to inflict serious bodily
 harm on another, or has acted in such a way as to create a
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 substantial risk of serious bodily harm to another, or has
 engaged in extreme destruction of property; and that there
 is a reasonable probability that this conduct will be
 repeated. Previous episodes of dangerousness to others,
 when applicable, may be considered when determining
 reasonable probability of future dangerous conduct. Clear,
 cogent, and convincing evidence that an individual has
 committed a homicide in the relevant past is prima facie
 evidence of dangerousness to others.

 N.C. Gen. Stat. § 122C-3(11)(b).

¶ 31 In its written Order, the trial court checked box number five, by which it found

 “by clear, cogent, and convincing evidence” “facts supporting involuntary

 commitment.” The trial court then listed those facts:

 Prior to court, [r]espondent insisted Judge recuse herself
 because unqualified to hear federal matters. He constantly
 interrupted proceedings; stating he was being stalked.
 Non-compliant when admitted to hospital and remains
 medication non-compliant. Has to be sequestered from
 others on unit because verbally abusive towards staff.
 Postures and paces. Told Doctor he would take her to court
 to “shut her up.” Dismissed outpatient treatment team.
 During direct examination, [respondent] babbled about
 intergalaxial [sic] conspiracies.

¶ 32 These fact findings are drawn directly from the evidence at respondent’s

 hearing. The trial court heard from Dr. Bronner that respondent had been previously

 hospitalized, had been medication non-compliant, had burned his furniture, had told

 Dr. Bronner he would take her to court to “shut her up[,]” was verbally abusive, and

 had had to be kept separated from other people on his unit due to his behavior and

 medication non-compliance. Dr. Bronner also stated that, because respondent
 IN RE: A.S.

 2021-NCCOA-585

 Opinion of the Court

 remained medication non-compliant, he would have to remain sequestered from

 others.

¶ 33 The trial court also observed in open court respondent interrupting Dr.

 Bronner’s testimony repeatedly, stating, during his own testimony, he would not take

 needed medical injections because he was paranoid about needles and robots

 “punishing” him through needles, stating he had blocked the corridors of his unit to

 stop people from harming him, and making many other incoherent statements.

¶ 34 Thus, here, the trial court satisfied the two prongs to support an involuntary

 commitment order because it made findings of respondent’s past behavior and

 findings indicative to his probability of future harm absent treatment. See In re Q.J.,

 ¶ 25. Accordingly, these findings of fact, while cryptic and bare boned, are sufficient

 to support the issuance of the Order and are supported by the testimony of

 respondent’s treating physician and the actions of respondent at the hearing. Thus,

 the trial court did not err in finding respondent was a danger to others.

 III. Conclusion

¶ 35 Accordingly, we affirm the trial court’s Order.

 AFFIRMED.

 Judges DIETZ and HAMPSON concur.